```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| JIA SHENG,<br><br>      Plaintiff,<br><br>      v.<br><br>M&T BANK CORPORATION, and<br>MANUFACTURERS & TRADERS TRUST<br>COMPANY d/b/a M&T BANK,<br><br>      Defendants. | No. 12 Civ. 01103 (HBS) |

**PLAINTIFF'S TRIAL MEMORANDUM**

Pursuant to Rule 16(e)(2) of the Local Civil Rules and the Final Pretrial Order dated June 2, 2014, Plaintiff Jia Sheng ("Plaintiff" or "Ms. Sheng") respectfully submits this trial memorandum in anticipation of the trial scheduled to commence on November 3, 2014.

**I. Summary of Facts**

Ms. Sheng began her employment with Defendants M&T Bank Corporation and Manufacturers & Traders Trust Company ("M&T Bank" or "Defendants") in January 2010 as a Quality Control Team Lead based in M&T's corporate headquarters in Buffalo, New York. Although her performance met or exceeded M&T's expectations for her position, Ms. Sheng reluctantly decided to resign her employment in March 2011 in order to relocate with her family to Los Angeles, California, where her husband had secured a new employment opportunity. Ms. Sheng's supervisor, Quality Assurance Manager Monica Holcomb, convinced her that, rather than resigning, she should instead remain in her position and work remotely from Los Angeles. Ms. Sheng agreed to this proposal and continued to perform her duties with her accustomed professionalism and quality performance while based in Los Angeles for approximately one

year, from June 2011 through May 2012, on an approved Alternative Work Arrangement ("AWA").

In late May 2012, however, Ms. Sheng informed M&T that she was pregnant. Shortly thereafter, on June 8, 2012, Ms. Sheng's supervisor requested that Ms. Sheng immediately resubmit the standard documentation to confirm her ongoing AWA, pursuant to which she had been successfully working remotely from Los Angeles (with the M&T's encouragement) for more than one year. Ms. Sheng complied with this instruction, and resubmitted her AWA forms the same day. In response to this submission, on June 28, 2012, Ms. Sheng was shocked to be informed by email and during a brief meeting with her supervisor that M&T had purportedly "modified" its AWA policy and would now require employees, including Ms. Sheng, to be physically present in Buffalo for at least two days per workweek – despite Ms. Sheng's longstanding and proven track record of exemplary performance while working from Los Angeles. Since Ms. Sheng was the only employee in her department to work remotely from the West Coast, she was also the only employee to be impacted by M&T's sudden and inexplicable change to its AWA policy.

After receiving notification of M&T's purported policy change, Ms. Sheng sent emails that same day to her supervisor and to M&T's Human Resources Department, asking to arrange a meeting with them to discuss the possibility of delaying her return to Buffalo until after she had given birth and completed an anticipated brief period of maternity leave as per the advice of her obstetrician. But in a meeting with her supervisor on July 3, 2012, Ms. Sheng was told that M&T's new AWA policy would be applied without exceptions, notwithstanding her request for a temporary accommodation.

The following week, Ms. Sheng contacted HR on multiple occasions regarding her request for a reasonable accommodation that would enable her to remain in Los Angeles – and to continue working remotely as she had done successfully for more than one year – for the remaining few months of her pregnancy and anticipated maternity leave, before relocating to Buffalo in compliance with M&T's directive. But the following week, Ms. Sheng's supervisor informed her that she could continue her employment and remain on the West Coast only if she would agree to commute to Buffalo twice each week beginning in August 2012. Ms. Sheng's supervisor also emphasized that Ms. Sheng's pregnancy and related medical needs were irrelevant under the new AWA policy, and that if Ms. Sheng could not comply with the new requirements, she should voluntarily resign her employment.

Ms. Sheng followed up on this discussion by providing M&T's HR representative, Ms. Hannibal, and her supervisor with a letter from her obstetrician confirming that she was not to fly during the remainder of her pregnancy, and inquiring about the status of her request for a reasonable accommodation. In response, Ms. Hannibal told Ms. Sheng that the matter was under review, and that she would receive an answer shortly. After not hearing anything further for 10 days, Ms. Sheng wrote to Ms. Hannibal again on July 30, 2012 to ask about the status of her request. When Ms. Hannibal did not respond, Ms. Sheng sent another follow-up email on August 2, 1012. The following week, on August 8, 2012, Ms. Hannibal sent Ms. Sheng an email stating that her request was still under review.

Finally, in a telephone conference between Ms. Sheng, her supervisor, and Ms. Hannibal on September 11, 2012, Ms. Hannibal informed Ms. Sheng that M&T was revoking her authorization to work from Los Angeles effective immediately, and that Ms. Sheng would be required to permanently relocate to Buffalo by no later than October 12, 2012, regardless of her

pregnancy-related restriction on traveling by air. Ms. Hannibal also emailed Ms. Sheng a letter – together with a *"Severance Agreement, General Release and Waiver"* – just before their telephone conference began on September 11, 2012. The letter stated that if Ms. Sheng would not confirm within the next three days (*i.e.,* by September 14, 2012) that she would be relocating to Buffalo within 30 days, she would be placed on "non-working" status effective September 15, 2012, and her employment with M&T would be terminated effective October 12, 2012.

Because of her obstetrician's advice that Ms. Sheng not jeopardize her pregnancy by flying back to Buffalo until after she had given birth, Ms. Sheng was obviously unable to agree to M&T's ultimatum. Ms. Sheng therefore sent an email to Ms. Hannibal on September 14, 2012, confirming what Ms. Hannibal already knew from their numerous prior discussions – that she was unable to return to Buffalo until after she gave birth, and therefore could not comply with the directive to relocate to Buffalo within 30 days.

Ms. Hannibal responded by email on September 18, 2012, stating that M&T was terminating Ms. Sheng's employment in light of her purported "*declination to continue employment with M&T Bank in the Quality Control Team Lead position located in Buffalo, New York*" – again, notwithstanding that Ms. Sheng had served successfully in that exact same position while working remotely from Los Angeles for more than one year, and despite Ms. Sheng's express willingness to relocate to Buffalo as requested if M&T would simply allow her to remain in Los Angeles for the final months of her pregnancy and anticipated brief period of maternity leave per the documented instructions of her obstetrician.

**II.     ISSUES OF LAW**

This is an action to redress Defendants' unlawful employment practices against Plaintiff, including:

4

    A.      Defendants' failure to grant Plaintiff a reasonable accommodation for her pregnancy and related medical condition – by permitting her to continue working from Los Angeles during the final months of her pregnancy pursuant to the documented instructions of her physician – in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law §§ 290 *et seq.*, and the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code §§ 12940 *et seq.*;

    B.      Defendants' discriminatory termination of Plaintiff's employment due to her pregnancy and/or pregnancy-related medical condition in violation of Title VII, the ADA, the NYHRL and FEHA; and

    C.      Defendants' unlawful interference with Plaintiff's anticipated exercise of her right to take a brief period of maternity leave in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*, and FEHA.

## III. Proposed Jury Instructions, Verdict Form And Voir Dire

Plaintiff's proposed jury instructions, verdict form, and voir dire are submitted as separate documents.

## IV. Witness List

Plaintiff's witness list is submitted as a separate document.

## V. Exhibit List

Plaintiff's exhibit list is submitted as a separate document.

## VI. Statement of Special Damages

See chart annexed hereto as **Exhibit A**

Dated: New York, New York
October 3, 2014

Respectfully submitted,

**THE OTTINGER FIRM, P.C.**

By: /s/ Ariel Y. Graff
Ariel Y. Graff
George Vallas

401 Park Avenue South
New York, New York 10016
Tel: (212) 571-2000
Fax: (212) 571-0505
ari@ottingerlaw.com
george@ottingerlaw.com

*Counsel for Plaintiff*

# EXHIBIT A

*Sheng, Jia v. M&T Bank*
**Plaintiff's Calculation of Damages as of 10.3.14**

| | |
|---|---|
| Total Base Backpay | *To be determined by jury at trial* |
| Liquidated Damages | *To be awarded by the Court as to all economic damages under FMLA upon entry of a judgment establishing Pltf. as prevailing party* |
| Compensatory Damages | *To be determined by jury at trial* |
| Punitive Damages | *To be determined by jury at trial* |
| Pre- and Post-Judgment Interest | *To be determined by the Court upon entry of a judgment establishing Pltf. as prevailing party* |
| Attorneys' Fees and Costs | *To be determined by the Court upon entry of a judgment establishing Pltf. as prevailing party* |

**Lost Salary From Termination through Maternity Leave**

| Termination | Maternity Leave | No. Weeks | Total |
|---|---|---|---|
| 10/12/12 | 1/4/13 | 12.00 | **$22,118.72** |

**Unemployed Period From Return to Work Through Empl. With Apex**

| Return to Work | Start at Apex | No. Weeks | Total |
|---|---|---|---|
| 3/1/13 | 7/1/13 | 17.43 | **$32,124.81** |

**Lost Earnings While at Apex**

| Company | Start Date | End Date | Weeks | Hours/Week | Rate | Total Earnings |
|---|---|---|---|---|---|---|
| APEX | 7/1/13 | 1/17/14 | 28.57 | 40 | $51.00 | $58,285.71 |
| M&T | 7/1/13 | 1/17/14 | 28.57 | 40 | $40.25 | $54,432.86 |
| | | | | | *Difference* | **-$3,852.86** |

**Lost Earnings while at Arvato (through 10.3.14)**

| Company | Start Date | Present | Weeks | Salary | Total |
|---|---|---|---|---|---|
| ARVATO | 1/20/14 | 10/3/14 | 36.57 | $75,000.00 | $52,747.25 |
| M&T | 1/20/14 | 10/3/14 | 36.57 | $80,500.00 | $56,615.38 |
| | | | | *Difference* | **$3,868.13** |